UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ECF Case

| | |
|---|---|
| TONJA FENTON,<br><br>Plaintiff,<br><br>vs.<br><br>DEPT. OF CORRECTIONS AND COMMUNITY SUPERVISION; COMMISSIONER ANNUCCI; SUPERINTENDENT SQUIRES; UNNAMED OFFICER JOHN DOE<br><br>Defendants. | 18-CV-10985-ALC<br><br>**AMENDED COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff Tonja Fenton, by and through her attorneys Debevoise & Plimpton LLP, hereby alleges her Complaint as follows:

## PRELIMINARY STATEMENT

1. This civil rights action, brought by plaintiff Tonja Fenton (hereinafter "Ms. Fenton" or "Plaintiff") for declaratory relief pursuant to 42 U.S.C. § 1983, arises from repeated instances of retaliation and sexual harassment and assault at Albion Correctional Facility ("Albion").

2. Ms. Fenton participated as a named plaintiff in the *Peoples v. Annucci* class action litigation filed against the New York Department of Corrections and Community Supervision ("DOCCS"). The settlement arising from the *Peoples* case has been widely recognized as a watershed moment in New York State correctional policies. The settlement—and Ms. Fenton—received national attention through numerous articles and even a book written by one of the lawyers for the plaintiff class.

3. DOCCS inexplicably sent Ms. Fenton to Albion upon her reincarceration, despite their awareness of the fact that Ms. Fenton's mistreatment at Albion served as the basis for the majority of Ms. Fenton's allegations in the *Peoples* litigation. In *Peoples*, Ms. Fenton explicitly named numerous Albion staff and administrators and detailed many incidents of mistreatment that she suffered there. A significant number of these staff members are still employed by Albion.

4. Since Ms. Fenton's return to Albion, she has been subjected to sexual abuse and harassment. In the most severe instance, Ms. Fenton's abuse was dealt by an officer whom she discussed in the original pro se complaint Ms. Fenton filed in *Fenton v. Nerber, et al*, which was later consolidated into *Peoples v. Annucci*.

5. Ms. Fenton has been further subjected to a broad range of retaliatory behavior, including but not limited to: punitive solitary confinement sentences, mail tampering, and the incitement of inmate attacks on Ms. Fenton. While the retaliation initially stemmed from Ms. Fenton's participation in *Peoples*, reporting the retaliation she suffers—and even appearing before this court—only results in augmented abuse.

6. DOCCS and its supervisors were, and continue to be, aware of the pervasive and persistent constitutional violations by DOCCS staff members against individuals in their custody. The attacks on Ms. Fenton are part of a larger pattern in which correctional officers use intimidation, retaliation, and sexual violence to control or punish inmates, particularly those that have repeatedly and publicly condemned their behavior.

7. Ms. Fenton now seeks redress against DOCCS, the DOCCS employees who retaliated against her, sexually assaulted her or facilitated this treatment, and their supervisors.

**JURISDICTION AND VENUE**

8. This action arises under the First and Eighth Amendments to the United States Constitution and under 42 U.S.C. §§ 1983 and 1988.

9. This court has jurisdiction under 28 U.S.C. §§ 1331 and 1343(a).

10. Plaintiff seeks declaratory relief pursuant to 28 U.S.C. § 2201. Venue is proper in this district under 28 U.S.C. § 1391(b).

**JURY TRIAL**

11. Ms. Fenton demands a trial by jury in this action.

**PARTIES**

12. Plaintiff Tonja Fenton is a female inmate currently in DOCCS custody at the Albion Correctional Facility, located in Albion, New York.

13. Plaintiff was at all times mentioned herein in the custody and control of DOCCS.

14. At all times relevant hereto, Defendant Anthony J. Annucci is the Commissioner of DOCCS. He is responsible for the care, custody, and control of all inmates housed in DOCCS facilities. He is the chief executive officer of DOCCS, and is responsible, consistent with the legal mandates governing DOCCS, for the management and control of all state prisons, and for all matters relating to the placement, supervision, promotion, and discipline of the uniformed staff of the prisons where women prisoners are confined. He is responsible, along with other Defendants, for the system of complaints, investigations, and discipline of staff misconduct, including sexual harassment and abuse, and for setting the standards by which such complaints are reviewed to determine the actions, if any, to be taken against staff. He is responsible for the policies and practices that have resulted in the deprivation of plaintiff's rights under federal law, and he has failed to take necessary and appropriate actions to prevent such deprivations.

15. At all times relevant hereto, Defendant Susan Squires is the Superintendent of Albion. She is responsible for the care, custody, and control of all inmates housed at Albion. She is the chief executive officer of Albion, and is responsible, consistent with the legal mandates governing DOCCS, for the management and control of Albion, and for all matters relating to the placement, supervision, promotion, and discipline of the uniformed staff of Albion. She is responsible, along with other Defendants, for the system of complaints, investigations, and discipline of staff misconduct, including sexual harassment and abuse, and for setting the standards by which such complaints are reviewed to determine the actions, if any, to be taken against staff. She is responsible for perpetuating the policies and practices that have resulted in the deprivation of plaintiff's rights under federal law, and she has failed to take necessary and appropriate actions to prevent such deprivations.

16. At all times relevant hereto, Officer John Doe is a known, unnamed, commissioned corrections officer at Albion. Officer Doe has acted in the capacity of agent, servant, and employee of DOCCS, within the scope of his employment as such, and acting under color of state law. He is directly responsible for the care, custody, and control of those inmates under his supervision. He is responsible, along with other Defendants, for perpetuating the policies and practices that have resulted in the deprivation of plaintiff's rights under federal law, and he has failed to take necessary and appropriate actions to prevent such deprivations. Defendant Officer Doe has sexually abused and harassed Plaintiff on more than one occasion.

## FACTUAL ALLEGATIONS

### A. Plaintiff Tonja Fenton Has a Long and Negative History with Albion Giving Rise to a Substantial Risk of Retaliation.

17. Tonja Fenton is a 45 year-old woman who is currently in DOCCS custody at Albion.

18. Ms. Fenton has been housed at Albion during two separate time periods. Ms. Fenton was originally housed in Albion beginning in 2011 for a three-year sentence.

19. During Ms. Fenton's first incarceration at Albion, she was sentenced to two years solitary confinement for three infractions: (1) helping another inmate purchase personal hair care appliances and sneakers; (2) reporting a sexual assault that was later deemed unsubstantiated; and (3) sending a food sample to a court in support of a lawsuit she filed alleging that corrections officers had retaliated against her by tampering with her food.

20. In connection with her first sentence at Albion, in July 2012, Ms. Fenton filed a *pro se* complaint in the Western District of New York against at least five staff members and the Superintendent of Albion. *See* Complaint, *Fenton v. Nerber et al*, no. 12-cv-06380 ("2012 Complaint").

21. Ms. Fenton's 2012 Complaint made highly critical allegations against Albion policies, actions, and specific Albion personnel.

22. Many of the prison officials who worked at Albion at the time of the class action and during Ms. Fenton's prior sentence are presently employed at Albion. For example, former Corrections Officer L. Collins is now the Deputy of Security at Albion. Former Corrections Officer Cataflu is now the Deputy Commissioner of Programs at Albion. Former Corrections Officer Kline, who was also employed at Albion at the time of the 2012 Complaint, is now a sergeant at Albion.

23. Officers currently employed at Albion have commented to Ms. Fenton about her negative history with Sergeant Kline.

24. Among the officers about whom she spoke critically in the 2012 Complaint, Ms. Fenton specifically discussed Officer Doe, who is also named as a defendant in the instant

suit. For example, in Paragraph 42 of the 2012 Complaint, Ms. Fenton stated that Officer Doe lied to Albion officials.

25. In March 2012, Plaintiff's *pro se* complaint in *Fenton v. Nerber* was consolidated into the class action *Peoples v. Annucci,* no. 11-cv-02694 (the "*Peoples* Complaint").

26. As one of named plaintiffs in the *Peoples v. Annucci* class action lawsuit, Ms. Fenton served then Corrections Officer L. Collins and then Deputy Superintendent Diane Cataflu as defendants in *Peoples v. Annucci*.

27. Ms. Fenton stated in the *Peoples* Complaint that she received three separate Solitary Housing Unit ("SHU") sentences totaling 730 days, and ultimately spent approximately 270 consecutive days in the extreme isolation of SHU, the majority of which she served at Albion. In her complaint, Ms. Fenton pointed by name to specific Albion personnel relevant to her mistreatment.

28. Ms. Fenton further stated in the *Peoples* Complaint that the Albion Superintendent at the time had the "authority and ability" to review, vacate, or reduce her inappropriately punitive SHU sentences and that he declined to do so, instead authorizing her continued confinement.

29. Ms. Fenton stated in the *Peoples* Complaint that her SHU sentence arose after she filed a report to Albion officials that a male corrections officer at Albion had sexually assaulted her as he escorted her outside her SHU cell. Ms. Fenton alleged that Albion officers discouraged her from filling the report and subsequently found her guilty of "false statements," sentencing her to 180 days in SHU in conjunction with a curtailing of multiple privileges. With reference to this allegation, Ms. Fenton specifically named the Deputy Superintendent of Albion as responsible.

30. Ms. Fenton detailed in the *Peoples* Complaint a separate SHU sentence arising in response to a retaliation suit Ms. Fenton filed in the Western District of New York, claiming that Albion staff was tampering with her food in SHU. Ms. Fenton stated that the hearing officer, Captain Collins, found her guilty of "threats" and sentenced Ms. Fenton to another 180 days in SHU after she sent the court a food sample as evidence. Ms. Fenton noted that this sentence came after Collin stated during the hearing that she "believe[d] no threat was intended by [Ms. Fenton]."

31. Ms. Fenton broadly stated in the *Peoples* Complaint that her confinement in SHU at the hands of the named Albion officers directly caused Ms. Fenton's severe psychological and physical deterioration.

32. Ms. Fenton detailed mistreatment including but not limited to: routine subjection to "the stench of toilet backups," the provision of "used linen stained with what appeared to be blood," the arbitrary denial of family visits, the arbitrary denial of allotted recreation time through subversive tactics, and the arbitrary denial of food through subversive tactics. Ms. Fenton explicitly referred to her time in the SHU at Albion as "hell."

**B. *Peoples v. Annucci* Class Action Settlement**

33. In Ms. Fenton's declaration in support of the motion for the class action settlement in *Peoples v. Annucci*, she referenced incidents of retaliation she suffered at Albion in response to her participation in the lawsuit. For example, she noted that an officer once put her in keeplock after calling her a "legal beagle" in the prison yard.

34. In her declaration, Ms. Fenton described the SHU sentence mentioned in paragraph 29 above as retaliation for her report of a specific incident of sexual assault.

35. In approving the *Peoples v. Annucci* settlement (the "*Peoples* Settlement"), Judge Scheindlin stated that "[t]he representative plaintiffs assisted in the litigation and risked retaliation for serving as the faces of this action."

36. As a result of the *Peoples* Settlement, DOCCS paid a $1.1 million dollar lump sum for attorney's fees, costs, and incentive awards. Ms. Fenton personally received $40,000 for her participation in the case.

37. DOCCS stated as recently as 2018 that the *Peoples* Settlement was a "historic agreement."[1]

38. The *Peoples* Settlement received national media attention.[2]

**C. Taylor Pendergrass Publication**

39. Taylor Pendergrass, a former attorney at the New York Civil Liberties Union (NYCLU), who served as counsel Class Counsel in the *People v. Annucci* litigation, wrote a novel about the litigation titled *Six by Ten: Stories from Solitary (Voice of Witness)* ("Pendergrass Book"). A chapter of the Pendergrass Book was devoted to Ms. Fenton and her experiences in solitary confinement.

40. The Pendergrass Book was published in 2018. The Pendergrass Book is widely available to the public for purchase through major book retailers, including Amazon.com, and thus fully accessible by Albion staff.

---

[1] DOCCS 2018 Annual Update, "DOCCS Continues to Improve the Conditions and Reduce the Use of Solitary Confinement in Its Facilities," available at http://www.doccs.ny.gov/DoccsNews/2018/Annual%20Update%20-%202018.pdf.

[2] *See, e.g.*, Alexander A. Reinert, "We Need To Treat Solitary Confinement Like The Human Rights Abuse It Is," Huffington Post, May 15, 2018, available at https://www.huffingtonpost.com/entry/opinion-reinert-solitary-confinement_us_5afb46a6e4b0779345d3c999; "Federal Judge Approves Solitary Confinement Overhaul in New York State," American Civil Liberties Union, Mar. 31, 2016, available at https://www.aclu.org/news/federal-judge-approves-solitary-confinement-overhaul-new-york-state; Margo Schlanger & Amy Fettig, "Class-Action Suit Brings Sweeping Changes to Solitary Confinement in New York," The American Prospect, Dec. 23, 2015, available at https://prospect.org/article/class-action-suit-brings-sweeping-changes-solitary-confinement-new-york; "Peoples v. Fischer (Challenging Policies Governing Use of Solitary Confinement in New York's Prisons)," New York Civil Liberties Union, available at https://www.nyclu.org/en/cases/peoples-v-fischer-challenging-policies-governing-use-solitary-confinement-new-yorks-prisons.

41. Albion staff members were aware of Ms. Fenton's inclusion the Pendergrass Book and approached Ms. Fenton about her role. For example, at one point Officer Parker of Albion approached Ms. Fenton to tell her that he obtained and read an advance copy of the Pendergrass Book. Officer Parker then informed Ms. Fenton that "it was a bunch of bullshit."

## I. Defendants Transferred Ms. Fenton to Albion Despite Actual and Constructive Knowledge of the Risk of Retaliation and Sexual Abuse.

### A. A History of Abusive Practices at New York State Correctional Facilities

42. Defendants are aware that prisoners are at risk of sexual abuse from prison staff. The Office of Special Investigation ("OSI") receives approximately 200 complaints of staff sexual misconduct and harassment each year.[3] These abuse histories make women especially vulnerable to coercion and manipulation.[4]

43. In addition to awareness based on the ample information regarding the problem of staff sexual abuse in correctional settings generally, Defendants are aware of the substantial risk to women prisoners of sexual misconduct by male staff in New York facilities given DOCCS'

[3] U.S. Dep't of Justice, Bureau of Justice Statistics, "Survey of Sexual Violence in Adult Correctional Facilities 2009–11- Statistical Tables" at 7-11 (Jan. 2014) ("2009-11 BJS Sexual Violence Statistics"), http://www.bjs.gov/content/pub/pdf/ssvacf0911st.pdf. In 2011, there were 184 allegations of staff sexual misconduct and 24 allegations of staff sexual harassment in New York. In 2010, there were 168 allegations of staff sexual misconduct and 65 of staff sexual harassment. In 2009, there were 173 allegations of staff sexual misconduct and 38 of staff sexual harassment.

[4] A 2013 report from the Department of Justice's ("DOJ's") Bureau of Justice Statistics states that "[i]nmates who experienced sexual victimization before coming to the facility were also more likely than inmates with no sexual victimization history to report incidents of sexual victimization involving other inmates and staff." U.S. Dep't of Justice, Bureau of Justice Statistics, "Sexual Victimization in Prisons and Jails Reported by Inmates, 2011-12" at 19 (May 2013) ("2011-12 BJS Statistics"), www.bjs.gov/content/pub/pdf/svpjri1112.pdf; Terri L. Messman-Moore, T.L. & Patricia J. Long, P.J., "Child sexual abuse and revictimization in the form of adult sexual abuse, adult physical abuse, and adult psychological maltreatment," 15 (5) J. Interpersonal Violence, 15(5), 489-502 (2000). Women with childhood sexual abuse history were more likely to experience adult sexual violence, physical violence and psychological maltreatment as adults, and were more vulnerable to verbal coercion or pressure from individuals in authority.

own *actual* experience, particularly because DOCCS knows that sexual abuse is significantly underreported in the prison context.[5]

44. The U.S. Department of Justice's Bureau of Justice Statistics periodically releases reports of anonymous surveys on sexual victimization in prisons and jails. From 2011 to 2015, staff-on-inmate victimization accounted for a 63 percent increase in substantiated allegations of sexual victimization.[6] According to one survey, New York State prisoners self-reported the highest rates of staff sexual abuse in the nation.[7]

45. Defendants know that cases that result in criminal prosecutions or the discipline of staff do not reflect the entire universe of staff misconduct, given that Defendants only investigate incidents of sexual misconduct, harassment, and abuse that have been reported, and Defendants know that staff sexual abuse is significantly underreported.[8] Victims of sexual abuse, generally, are unlikely to come forward with complaints of sexual misconduct due to embarrassment, humiliation, and a fear that such complaints will be greeted with skepticism or disbelief.

46. These concerns are exacerbated in a correctional setting, where the persons to whom such complaints are to be made are colleagues of the perpetrator(s) of the abuse, putting the victim at risk of retaliation; where complaints of such abuse are not maintained in a confidential fashion; and where there is a well-founded belief by women prisoners that such complaints will be greeted with skepticism, and will not result in any action against the

---

[5] U.S. Dep't of Justice, "Regulatory Impact Assessment for PREA Final Rule" at 17-18 (May 17, 2012), http://www.ojp.usdoj.gov/programs/pdfs/prea_ria.pdf ("DOJ Regulatory Impact Assessment").

[6] U.S. Dep't of Justice, Bureau of Justice Statistics, "Sexual Victimization Reported by Adult Correctional Authorities, 2012-15" at 6 (July 2018), https://www.bjs.gov/content/pub/pdf/svraca1215.pdf.

[7] U.S. Dep't of Justice, Bureau of Justice Statistics, "Sexual Victimization in Prisons and Jails Reported by Inmates, 2008-09" at 9 (2010), http://bjs.ojp.usdoj.gov/content/pub/pdf/svpjri0809.pdf ("2008-09 BJS Statistics").

[8] *See* DOJ Regulatory Impact Assessment at 17-18 (concluding that, based upon the 2008-09 BJS Statistics survey, between 69 percent and 82 percent of inmates who reported sexual abuse in response to the survey had never reported an incident to corrections staff).

perpetrator. Women prisoners are justified in believing that their reports will be disbelieved; of the allegations of staff sexual misconduct that are reported, DOCCS substantiates only a small percentage, a percentage that continues to fall.[9]

47. Despite knowledge of this risk, Defendants permit officers virtually unfettered access to private, unmonitored areas, such as bathrooms, kitchen store rooms, storage closets, slop sink areas, basements, classrooms, laundry areas, and private areas of prison yards. At the same time, Defendants fail to prohibit officers from being alone with women prisoners in such areas where sexual abuse of women prisoners is easily accomplished. When instances of staff sexual misconduct have been substantiated, they are usually found to have occurred in these isolated, and largely unmonitored, areas. Staff suspected of sexual abuse are allowed to continue their usual posts and permitted to access private, unmonitored areas, and are permitted to continue to guard or to have contact or proximity with the prisoner who has complained about the officer.

48. To the extent Defendants have installed or required installation of surveillance cameras, use of those cameras for supervision remains grossly inadequate to protect women prisoners. Many enclosed and isolated areas inside the prison where sexual abuse is more likely to occur are completely outside of any video or audio surveillance. These areas include storage closets, laundry rooms, slop sink areas, sheds, outside work areas, and basements. Officers are knowledgeable regarding camera placement and with relative ease may move inmates into areas of the facility with inadequate or nonexistent camera footage.

49. DOCCS is aware of the need for enhanced surveillance, as seen through the December 2016 initiation of the Body Worn Camera pilot program.[10] Albion participates in this

[9] 2009-11 BJS Sexual Violence Statistics at 7-11.

pilot program, and many of the officers wear body cameras on a regular basis. However, the officers will strategically turn off the body cameras at their discretion, leaving them to interact with inmates unsupervised.

50. Defendants know that, given the reluctance of staff sexual abuse victims to come forward, having an investigative and discipline system that relies primarily on women prisoners to volunteer complaints is insufficient to prevent and remedy this misconduct. Nonetheless, Defendants rely on such a system and fail to utilize other means to root out sexual misconduct.

51. Women prisoners are unlikely to report sexual abuse because they understand they may be subject to punishment for reporting sexual harassment by staff, which chills and deters them from reporting, and thereby perpetuates staff misconduct. Women understand that they may be charged with other disciplinary offenses, such as possession of contraband, being out of place, inappropriate conduct with an officer, or making false statements if DOCCS does not believe the complaint was made in good faith.

**B. Defendants had Actual and Constructive Knowledge of the Risk of Retaliation.**

52. Plaintiff repeats and realleges paragraphs 17 through 41 as if fully set forth herein.

53. The intensely public nature of Ms. Fenton's dispute with Albion staff and procedures sufficiently put Defendants on constructive notice of the risk that a return to Albion would result in retaliatory behavior taken against Ms. Fenton.

54. Ms. Fenton wrote multiple letters to Defendants Superintendent Joseph and Commissioner Annucci, as well as Deputy Commissioner for Program Services McCoy and

---

[10] *New York State Department of Corrections and Community Supervision: Fiscal Year 2017-18 Budget Hearing Before the Senate Standing Committee on Finance* (2017) (statements of Anthony J. Annucci, Acting Commissioner of New York State Department of Corrections and Community Supervision).

Assistant Commissioner McGrath, requesting that she not be sent to Albion. In these letters, Ms. Fenton expressly stated her concerns of retaliation and abuse.

55. Pendergrass spoke with DOCCS counsel Kevin Bruen Deputy Commissioner and Counsel to express concerns that Ms. Fenton would be retaliated against if she were sent to Albion. Pendergrass requested that Ms. Fenton be sent to an alternative medium security facility.

56. On or about October 6, 2017, Ms. Fenton believed she was being told to board the transfer bus to Albion. For security purposes, DOCCS does not provide inmates with advance notice of where they will be transferred, but Ms. Fenton was informed by her attorneys that if a transfer bus arrived for her on a Thursday, she was being transferred to Taconic Correctional Facility ("Taconic"). Conversely, Ms. Fenton understood that a transfer bus arriving any day but Thursday would mean she was being transferred to Albion. Therefore, when the transfer bus arrived on a day that was not Thursday, Ms. Fenton believed she was being transferred to Albion.

57. Ms. Fenton then showed Sergeant McDaniels documentation related to the *Peoples* case to explain why she was afraid to return to Albion. Sergeant McDaniels stated that Ms. Fenton would nevertheless have to board the bus, further indicating that Ms. Fenton was being transferred to Albion. Ms. Fenton was so fearful of Albion that she refused to board the bus and was consequently placed in SHU at Bedford Hills on or about October 6, 2017.

58. On or about November 7, 2017, Ms. Fenton was handcuffed, sedated, and placed on the transfer bus. When Ms. Fenton awoke, she was at Albion and was directly taken to the mental health observation unit.

### C. Defendants Have the Ability to Transfer Ms. Fenton.

59. Commissioner Annucci has final policymaking authority within DOCCS. As commissioner, and pursuant to New York law, he has ultimate authority with regard to all of DOCCS' internal rules, regulations, policies, procedures, and customs. Commissioner Annucci and his staff periodically review these policies and procedures. He reviews data and statistical analyses that reflect the effects of these policies and procedures. If he deems it necessary, Commissioner Annucci has the authority to cause disciplinary policies and procedures to be amended, adopted, or repealed.

## II. Ms. Fenton Has Suffered Repeated Incidents of Sexual Abuse and Harassment While at Albion.

60. Ms. Fenton has been the victim of sexual abuse and harassment at the hands of Officer Doe, beginning in November 2017.

61. The first incident occurred when Officer Doe made sexual advances toward Ms. Fenton outside of her dormitory sometime between November 21, 2017 and November 30, 2017. Officer Doe approached Ms. Fenton in her dormitory and called her out to the porch, instructing the two inmates on the porch at the time to go inside. Officer Doe then began grabbing his groin in a sexual manner and told Ms. Fenton, "You can make things easier on yourself."

62. Ms. Fenton reported the November 2017 incident to OSI Investigator Maldonado. After Investigator Maldonado spoke with Officer Doe, she requested that Ms. Fenton sign a form stating that Officer Doe did not sexually assault her.

63. A second incident occurred in December of 2017 when Officer Doe exposed himself to Ms. Fenton. Officer Doe entered Ms. Fenton's cube sometime between the hours of 4:30 p.m. and 10:00 p.m. Officer Doe asked Ms. Fenton if she "was good," and when she looked

up, Ms. Fenton saw that Officer Doe was exposing his genitals to her with his body positioned halfway in and halfway out of her cube.

64. Ms. Fenton reported the December 2017 incident but declined to give full details or Officer Doe's name. Ms. Fenton feared that an investigator would inform Officer Doe that Ms. Fenton had made a report against him.

65. A third incident occurred on or about July 16, 2018, when Officer Doe forced Ms. Fenton to perform oral sex on him. Officer Doe approached Ms. Fenton in her cube and stated that he wanted to speak with her, and at which point he forced her to perform oral sex on him.

66. Following this incident, Ms. Fenton retained Officer Doe's seminal fluid in her mouth and saved it in containers in her cube. On three occasions, she attempted to send the seminal fluid to individuals outside of Albion so that it could be DNA tested as proof of the assault. The semen samples never made it to their intended recipients.

67. On another occasion, Officer Doe waited outside the medical facilities for Ms. Fenton on or about the night of February 4, 2019 while she was inside picking up her prescriptions. Regarding her reports of abuse, Officer Doe warned Ms. Fenton to "let it go," and told her that what she wrote was "fucked up."

68. Ms. Fenton is able to provide specific and identifying details about Officer Doe's genitalia.

69. Between November 2017 and December 2017, Officer Smith approached Ms. Fenton while she was using the telephone. After turning off the lights in the recreation room, Officer Smith directed Ms. Fenton to the side of the room out of the Albion camera's view. Smith told Ms. Fenton that he wanted to speak with her about "the other morning" when

she failed to wake up for a morning callout. Officer Smith told Ms. Fenton, "I can do anything I want to at this time." Officer Smith left a note on Ms. Fenton's cube while making his rounds that evening. The note indicated that she could avoid future punishment by performing oral sex on him.

70. Following the incident with Officer Smith, Ms. Fenton wrote letters to Commissioner Annucci, Assistant Commissioner McGrath, Deputy Commissioner McCoy, and Governor Cuomo. No action was taken in response to Ms. Fenton's letters.

71. One night between February 2018 and April 2018, Officer Lawrence threatened Ms. Fenton with forcing her to perform oral sex on him. At approximately 4 a.m., Ms. Fenton got up to use the restroom and smoke a cigarette. When Ms. Fenton returned from the restroom, Officer Lawrence had flipped over her mattress and tossed her belongings all over her cube. While Ms. Fenton walked past Lawrence to return to the bathroom, Lawrence said, "It's alright, you'll be sucking my dick by morning."

72. At 7:00 a.m. when the phone lines opened, Ms. Fenton called in to report Officer Lawrence by dialing #77. Investigator Farrell from OSI came to investigate the complaint. Ms. Fenton provided Farrell with details, but ultimately no action was taken against Lawrence. Lawrence then wrote Ms. Fenton a ticket for harassment and interference.

## III. Ms. Fenton Has Suffered Extensive and Ongoing Retaliation.

### A. Disciplinary Retaliation

73. Unless directed to do so by Albion officials, Ms. Fenton does not leave her unit, even for recreation, meals, and programs, for fear that any action could provoke retaliation.

74. On or about November 20, 2017, Ms. Fenton was placed in SHU. While Ms. Fenton was on the phone with her partner, Sergeant Cleary told her that he received a "call from Albany" stating that Ms. Fenton was "Max A Status" and thus supposed to be in SHU. No

further explanation was provided, and Ms. Fenton then spent the night in SHU. The following day, Ms. Fenton was released from SHU without additional explanation. Ms. Fenton was later told that her placement in SHU was a "bureaucratic mistake."

75. On or about January 25, 2018, Ms. Fenton submitted a written complaint against Sergeant Blye for encouraging inmates to attack her in the January 24, 2018 incident detailed in paragraph 79.

76. On or about January 26, 2018, Ms. Fenton was placed in SHU for five days without receiving a ticket for an infraction. She was released without explanation.

77. Ms. Fenton later learned that she was placed in SHU on January 26, 2018 due to multiple fabricated reports of infractions. The reports alleged that Ms. Fenton was being investigated for possession of a cellphone, gun, and escape plans. Investigator Kendraw from OSI came to investigate. Investigator Kendraw informed Ms. Fenton that Albion staff stated Investigator Maldonado of OSI directed them to place her in SHU. Because this was incorrect, Investigator Kendraw called Superintendent Squires, and Superintendent Squires personally called to have Ms. Fenton released.

**B. Retaliatory Incitement of Inmate Violence and Failure to Protect Ms. Fenton**

78. In November of 2017, inmate Malloy attacked Ms. Fenton, unprovoked, in the bathroom area.

79. On or about January 24, 2018, Ms. Fenton was attacked by multiple inmates. Sergeant Blye was present and encouraged the attack on Ms. Fenton. Inmate Malloy told Ms. Fenton that the inmates were told to attack her because of the complaint Ms. Fenton filed against Officer Doe. Ms. Fenton incurred multiple cigarette burns and multiple cuts from the attack.

80. In approximately May or June of 2018, Ms. Fenton was attacked by a group of inmates while on the phone with her partner. Inmate Haynes approached Ms. Fenton and told her to hang up the phone and a group of inmates cornered Ms. Fenton. Ms. Fenton attempted to get the officer on duty's (Officer Newman) attention, but Newman walked over to where the inmates were gathered and silently watched. Inmate Haynes hit and threw a chair at Ms. Fenton, but still Officer Newman did not intervene. Ms. Fenton's partner, who was still on the phone line, called Albion with an audio recording of the attack; only then was the inmate punished.

81. Approximately two weeks later, Ms. Fenton was moved to the same unit as her attacker. Ms. Fenton protested the move, but Sergeant Maluski threatened to send Ms. Fenton to SHU if she did not comply.

82. On or around June 21, 2018, Inmate Redding approached Ms. Fenton's cube and said that Sergeant Shepherd told Redding that the correctional officers do not like Ms. Fenton and had ordered the inmates to attack her.

83. On or about October 20, 2018, Inmate Haynes vandalized Ms. Fenton's cube. Ms. Fenton reported the incident to Officer Theo Flagler. While Ms. Fenton was sleeping that evening, she was attacked. Ms. Fenton's lip was split open and her face was swollen as a result. Ms. Fenton reported the attack to "Mr. S," a short, heavyset guard with short hair whose nickname at Albion is "Dad." After Mr. S took no action, Ms. Fenton reported the attack to Sergeant Sidira, who said he would make note of the incident after Ms. Fenton stated that she was concerned she would be attacked again.

84. Approximately two days later, Ms. Fenton's cube was again vandalized and all her family photos were taken. Ms. Fenton reported the incident to Sergeant Lugo and requested to be placed in protective custody. Sergeant Lugo agreed to move Ms. Fenton to another unit

while an investigation was conducted. When Sergeant Hirschman took over at the end of Sergeant Lugo's shift, Ms. Fenton explained the attack, the vandalism, and her injuries. Sergeant Hirschman stated that he would speak with Inmates Haynes, Brown, and Tejan, who initiated the attack on Ms. Fenton, while Ms. Fenton was called to the medical building for her injuries.

85. The next morning, Ms. Fenton received a ticket for failing to report her injuries, and did not receive protective custody. At the same time, Sergeant Hirschman ordered a urine test and cell frisk for Ms. Fenton under suspicion. Ms. Fenton's ticket was ultimately dismissed when Sergeant Sidira testified that Ms. Fenton promptly and repeatedly complained about the attack.

86. On at least one occasion, Officer Doe filed a complaint against Inmate Beasley and signed it in Ms. Fenton's name. Officer Doe later showed the complaint to the inmate in an attempt to incite violence against Ms. Fenton. Ms. Fenton filed a request for the complaint under the New York State Freedom of Information Law (Public Officers Law §87 et. seq.). On July 2, 2018, Ms. Fenton received a reply from P. Barhite, SORC-FOIL Officer denying her FOIL request, labeled FOIL 18-136. Despite the fact that the initial request contained all of Ms. Fenton's information, along with Inmate Beasley's name, the denial stated that because Ms. Fenton "drop[s] numerous tabs," the normally requisite amount of information would in this case be insufficient. To date, Ms. Fenton has yet to receive a copy of the fraudulent complaint submitted by Officer Doe.

**C. Retaliation in Response to Court Appearances**

87. On or about January 24, 2019, the day after Ms. Fenton appeared telephonically for a status conference related to these proceedings, Ms. Fenton was called to the medical department without reason or explanation. While returning to her cell, Ms. Fenton passed investigators carrying what she identified as her legal papers. When she returned to her cell, her

legal documents had been taken, and she found a cell receipt stating that a frisk was conducted. Ms. Fenton was never given an explanation for the cell frisk and confiscation of her documents.

88. On or about February 8, 2019, the day after Ms. Fenton appeared telephonically for a status conference related to these proceedings, Ms. Fenton was moved to four different units without reason or explanation. The first move took place before the 7:30 a.m. count, at which time she was told she would be moving "up the hill" to preferred housing. Later in the afternoon of February 8, 2019, after Ms. Fenton had unpacked all of her belongings, Albion staff forced Ms. Fenton to move back "down the hill." Several hours after the second move, Albion forced Ms. Fenton to again move back "up the hill." The morning of February 9, 2019, Albion staff again moved Ms. Fenton back "down the hill."

89. Following the February 8 to February 9 moves, several Albion officers mocked Ms. Fenton, asking her how many times she had been moved that day. Another officer insinuated that the administration repeatedly moved Ms. Fenton to torment her.

90. Several days after the February 8 to February 9 moves, an inmate told Ms. Fenton that the inmate heard from her supervisor at work that the administration repeatedly moved Ms. Fenton because she was a "snitch."

**D. Retaliatory Mail Tampering**

91. Albion staff tampered with Ms. Fenton's mail on three separate occasions.

92. After Officer Doe forced Ms. Fenton to perform oral sex on him, she retained his semen in her mouth and subsequently spit it into three separate containers.

93. Between November 30, 2018 and December 12, 2018, Ms. Fenton twice attempted to send a letter containing the sample to her domestic partner for testing that could confirm she was assaulted. Ms. Fenton's domestic partner did not receive either letter.

94. Fearing that Albion was interfering with mail to her partner, Ms. Fenton then mailed the third sample to a neighbor along with a two-page letter. When the neighbor received the envelope, however, it appeared to have been ripped open and resealed, and was missing the second page of the two-page letter.

## IV. Ms. Fenton's Medical Condition

95. Ms. Fenton is a survivor of cervical cancer, for which she underwent chemotherapy and radiation treatment.

96. One year ago, in response to an abnormal pap smear and colposcopy, Ms. Fenton was told that she requires a Loop Electrosurgical Excision Procedure ("LEEP") to remove the potentially cancerous cells.

97. Ms. Fenton has refused to undergo LEEP because it would require her to be anesthetized, and she is fearful of what Albion officers could do to her while she would be sedated.

98. NYCLU informed DOCCS of Ms. Fenton's concerns and sought a conditional or temporary transfer for the duration of her procedure, but DOCCS refused.

99. Delaying LEEP increases the risk of cervical cancer and other future harm.

# LEGAL CLAIMS FOR RELIEF ON BEHALF OF PLAINTIFF

## I. 42 U.S.C. § 1983/Retaliation in Violation of Plaintiff's First Amendment Rights

100. Plaintiff repeats and realleges paragraphs 1 through 99 as if fully set forth herein.

101. Defendants, through their policies, practices, acts, and omissions, have instituted a campaign of retaliation and intimidation against Tonja Fenton for exercising and engaging in acts of expression protected by the First Amendment of the United States Constitution.

102. As a direct result of Defendants' retaliatory actions, Tonja Fenton has suffered and will imminently suffer irreparable injury, and she is entitled to injunctive relief to avoid further injury.

## II. 42 U.S.C. § 1983/Violation of Plaintiff's Eighth Amendment Rights

103. Plaintiff repeats and realleges paragraphs 1 through 99 as if fully set forth herein.

104. Defendants, through their policies, practices, acts, and omissions, exhibit deliberate indifference to the sexual harassment and abuse of Tonja Fenton, in violation of her right to be free from cruel and unusual punishment under the Eighth Amendment of the United States Constitution.

105. Defendants, through their policies, practices, acts, and omissions, subject Tonja Fenton to the unnecessary and wanton infliction of pain, and emotional and physical injury in violation of the Eighth Amendment of the United States Constitution.

106. With deliberate indifference to the substantial risk of serious harm to the plaintiff, Defendants fail appropriately to assign and supervise staff, subjecting Tonja Fenton to sexual abuse and harassment by staff, to retaliation for reporting staff sexual misconduct, to verbal abuse, and to violations of privacy in violation of the Eighth Amendment of the United States Constitution.

107. With deliberate indifference to the substantial risk of serious harm to the plaintiff, Defendants fail to appropriately act upon complaints of sexual misconduct, subjecting Tonja Fenton to sexual abuse and harassment by staff, to retaliation for reporting staff sexual misconduct, to verbal abuse, and to violations of privacy in violation of the Eighth Amendment of the United States Constitution.

**PRAYER FOR RELIEF**

As a result of Defendants' policies, practices, acts, and omissions, Plaintiff has suffered and will continue to suffer irreparable injury, including continued incarceration under the substantial risk and persistent threat of retaliation, sexual assault, abuse and harassment, pain, shame, humiliation, degradation, emotional distress, embarrassment, and psychological distress.

WHEREFORE, Plaintiff respectfully requests that the Court grant the following relief against Defendants:

1. A determination that the acts and omissions described herein violated Plaintiff's rights under the First and Eighth Amendments to the United States Constitution.

2. An order requiring that Defendants transfer Ms. Fenton to an alternative medium security facility in New York State.

3. A jury trial on all issues triable by jury.

4. Enjoin Defendants and their successors, agents, servants, employees, and those in active concert or participation with them from subjecting Ms. Fenton to verbal, physical, and sexual abuse and the threat of sexual abuse.

5. Retain jurisdiction in this case until the unlawful conditions, practices, policies, acts, and omissions complained of herein no longer exist.

6. Grant such other and further relief as this court deems just and proper.

February 21, 2019

Respectfully submitted,

/s/ Jyotin Hamid

Jyotin Hamid (jhamid@debevoise.com)
Melanie Burke (mburke@debevoise.com)
Ashley Fillmore (afillmore@debevoise.com
DEBEVOISE & PLIMPTON LLP
919 Third Avenue
New York, New York 10022
(212) 909-1031

*Attorneys for Plaintiff Tonja Fenton*